## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,      CRIM. NO. 16-20460

              Plaintiff,      HON. MARK A. GOLDSMITH

v.

D-4 LOMNIL JACKSON,

              Defendant.

_____/

### United States' Response Opposing the Defendant's
### Motion for Compassionate Release [1329]

Lomnil Jackson pleaded guilty to Racketeering Conspiracy, in violation of 18 U.S.C § 1962(d). Jackson admitted to being a member of the Six Mile Chedda Grove criminal enterprise (Six Mile). Six Mile trafficked in dangerous drugs, controlled territory, and intimidated and shot rival gang members. Jackson admitted, as part of his membership in Six Mile, to conspiring to commit murders, assaults, and to distributing controlled substances while armed with firearms.

Jackson had previously been convicted of receiving stolen property and assaulting/resisting/obstructing a police officer in 2010; felony carrying concealed weapons in 2012; and felon in possession of a firearm and felony firearm in 2013, for which he served 2 years in prison and received 24 rule violations while incarcerated. (PSR at ¶¶75-77).

1

Jackson was sentenced by this Court to serve 150 months in prison and a 3 year term of supervised release, and he began serving his current sentence on October 31, 2019. (Judgment, ECF No. 1127, PageID.13849-50). He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

Jackson does not qualify for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Although Jackson's heightened risk from Covid-19 based on his obesity qualifies as an "extraordinary and compelling reason[]" for release under § 1B1.13(1)(A) & cmt. n.1(A), Jackson is not otherwise eligible for release.  Nor has Jackson provided any evidence to support his new claim in his motion that the caregiver for his minor child is incapacitated.

Jackson's offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2), because he is a member of a violent street gang who conspired to commit murder. Jackson also has a lengthy history of infractions while incarcerated during previous state prison terms, and several infractions while awaiting trial at Milan FDC.  (PSR at ¶ 77; Ex. 5, BOP Discipline Records (under seal)). After serving such a relatively short amount of time of his total prison term, Jackson remains as dangerous today as the day he was

2

first imprisoned.  And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release, because it is necessary for Jackson to serve the remainder of his prison term (approximately 8 years, 5 months with good conduct time) to provide just punishment for his crimes, for there to be any hope of deterrence, and to protect the public from further crimes of the defendant for at least the next 8.5 years, if not longer, provided some rehabilitation can yet occur.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Jackson, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of October 19, 2020, this process has already resulted in at least 7,837 inmates being placed on home confinement. *See* BOP Covid-19 Website. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845—the Court should deny Jackson's motion for compassionate release.

## Background

Jackson is a member of the violent, criminal street gang, Six Mile Chedda Grove. His participation in that gang included conspiring to commit murder and the distribution of controlled substances in furtherance of the criminal enterprise while armed. Six Mile Chedda Grove is responsible for a number of shootings, including homicides in Detroit, with Jackson himself being admittedly involved in multiple murder conspiracies for which he was held responsible by this Court and admitted to as part of the factual basis for his plea. (PSR at ¶¶ 48, 54; Jackson Rule 11 (ECF No. 889, PageID.8267-68)). Jackson also furthered the illegal activities of Six Mile by trafficking in drugs, further enabling the gang to proliferate and engage in violent acts. Moreover, Jackson, as well as other Six Mile members, advanced their racketeering activities by projecting power as a gang and by intimidating the public by expressing their willingness to engage in violence. Jackson and other 6 Mile members were depicted together in numerous photographs and rap videos posted on the Internet, openly displaying their firearms, exhibiting their allegiance with one another as a gang, and stating their willingness to engage in crimes of violence, including murder:



*Jackson, left, depicted holding a firearm with fellow Six Mile members Patrick Johnson and Carlo Wilson.*

Jackson posted other photographs depicting himself with firearms:



*Jackson depicted holding an assault-type rifle with drum magazine.*

Jackson began serving his prison sentence on October 31, 2019 and is currently incarcerated at USP Victorville. He is 27 years old, and his projected release date is March 10, 2029. His only underlying medical condition supported by the record is obesity. Nevertheless, Jackson has moved for compassionate release, citing alleged medical conditions of "serious deterioration of his mental health," "high blood pressure," and obesity amid the Covid-19 pandemic. Jackson also cites "the incapacitation of [his] minor child's caregiver," claiming this "makes him the only available caregiver." Notably, his request to the Warden did not cite high blood pressure, or allege caregiver incapacitation, but instead he claimed he suffered from asthma and that his mother was ill (whereas in the PSR, the child's mother is identified as caregiver). (Ex. 1, Request to BOP for CR (under seal); PSR at ¶ 89).

6

## Argument

**I.**    **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

   **A.**    **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 961 F.3d at 834. Social visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now

temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 7,800 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced

ability to supervise inmates who have been released. All of those decisions require

channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in

normal circumstances. That is why Congress tasked the Bureau of Prisons to make

them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b)

("Notwithstanding any other provision of law, a designation of a place of

imprisonment under this subsection is not reviewable by any court."); *United*

*States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6,

2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the

Bureau of Prisons."). It is especially true now, given the Bureau of Prisons'

substantial and ongoing efforts to address the Covid-19 pandemic.

## II.    The Court should deny Jackson's motion for compassionate release.

Jackson's motion for a reduced sentence should be denied. A district court has

"no inherent authority . . . to modify an otherwise valid sentence." *United States v.*

*Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority

to modify a defendant's sentence is "narrowly circumscribed." *United States v.*

*Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory

exception, a district court "may not modify a term of imprisonment once it has

been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow.

*United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). And as the Sixth Circuit recently held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

13

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. Jackson has satisfied the statutory exhaustion requirement; however, he raises new grounds for relief in his motion not previously raised to the BOP that should be precluded from consideration for the first time here.

Jackson has satisfied the statutory exhaustion requirement, to some extent. He submitted a request to the warden for release on August 10, 2020, citing specifically in connection to the ongoing pandemic:

1. Obesity
2. Asthma
3. Serious functional impairment
4. Deteriorating physical and mental health issues
5. His mother "is old, sick and needs [him] to care for her."

(Ex. 1, Request to BOP for CR (under seal)).

The warden denied his request on October 1, 2020. (Ex. 2, BOP Denial of CR (under seal)). More than 30 days elapsed from his initial request until he filed this motion on September 24, 2020. In his motion, Jackson submitted the following grounds for relief related to the pandemic:

14

1. Serious deterioration of his mental health
2. High blood pressure
3. Obesity
4. "The incapacitation of [his] minor child's caregiver, makes him the only available caregiver."

The only issues raised in his motion which he also raised to the BOP are obesity and his alleged deteriorating mental health.  According to the PSR, the mother of Jackson's minor child is responsible for the child's care, and so that is also a new claim not raised below; as previously Jackson requested relief in order to care for his mother, not his child. (PSR at ¶ 89)

The provision of the First Step Act of 2018 permitting a defendant-initiated motion includes an exhaustion requirement. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018). A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). As the Sixth Circuit recently held in *Alam*, this statutory exhaustion requirement is "a mandatory condition" that "must be enforced" when the government raises it. *Id.* at 832–36; *accord United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020).

15

Section 3582(c)(1)(A) also means that an inmate may not move for compassionate release on a different ground than the one he raised during the administrative process. The whole point of § 3582(c)(1)(A)'s exhaustion requirement is to ensure that the Bureau of Prisons has the opportunity to evaluate and consider an inmate's request first, while allowing the inmate to seek relief in court if the Bureau of Prisons denies or fails to act upon the request. *Alam*, 960 F.3d at 835–36. So when "the factual basis in the administrative request and the motion before the court are different, a defendant does not satisfy the exhaustion requirement because he does not give the BOP an opportunity to act on the request before [he] brings his request to the courts." *United States v. Asmar*, No. 18-20668, 2020 WL 3163056, at *3 (E.D. Mich. June 5, 2020); *accord United States v. Mogavero*, No. 15-00074, 2020 WL 1853754, at *2 (D. Nev. Apr. 13, 2020) ("Proper exhaustion necessarily requires the inmate to present the same factual basis for the compassionate-release request to the warden."); *United States v. Jenkins*, 2020 WL 1872568, at *1 (D. Neb. Apr. 14, 2020); *United States v. Valenta*, 2020 WL 1689786, at *1 (W.D. Pa. Apr. 7, 2020).

The best reading of Sixth Circuit law is that § 3582(c)(1)(A) requires issue-specific exhaustion. As the Sixth Circuit has explained, an exhaustion statute "written in more general terms" commands "issue exhaustion if an agency's rules so require." *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 746–47 (6th Cir. 2019)

(citing *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006)). Section 3582(c)(1)(A) is just such a statute, and the agency's rules here require an inmate to identify "[t]he extraordinary or compelling circumstances that the inmate believes warrant consideration" for compassionate release. 28 C.F.R. § 571.61(a)(1). Thus, an inmate seeking relief based on a combination of Covid-19 and a particular medical condition or conditions must first make *that* specific request to the Bureau of Prisons before seeking relief in court. *Island Creek Coal Co.*, 937 F.3d at 746–47; *see Alam*, 960 F.3d at 834–36 (emphasizing the issue-specific nature of exhaustion under § 3582(c)(1)(A)).

Jackson only complied with § 3582(c)(1)(A)'s mandatory exhaustion requirement as to those grounds previously raised with BOP in connection with the Covid-19 pandemic: obesity and mental health.  Thus, this Court should not consider any new grounds raised for the first time herein.  In any event, Jackson is ineligible  for release for other reasons.

### B.    Jackson is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Even if Jackson had exhausted his administrative remedies as to all of his claims, compassionate release would be improper. Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well as developing "the criteria to be applied and a list of specific examples" for when

release is permitted. 28 U.S.C. § 994(t). The compassionate-release statute thus permits a sentence reduction only when "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

Because the Sentencing Commission fulfilled Congress's directive in USSG § 1B1.13, compliance with that policy statement is mandatory for any defendant seeking compassionate release under § 3582(c)(1)(A). The Supreme Court has already reached the same conclusion for compliance with USSG § 1B1.10 under 18 U.S.C. § 3582(c)(2), based on the statutory language there. *Dillon v. United States*, 560 U.S. 817, 827 (2010). And the statutory language in § 3582(c)(1)(A) is identical to the language in § 3582(c)(2). *Compare* § 3582(c)(1)(A) (requiring that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"), *with* § 3582(c)(2) (same). When Congress uses the same language in the same statute, it must be interpreted in the same way. *United States v. Marshall*, 954 F.3d 823, 830 (6th Cir. 2020). In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014) (citing *Dillon*, 560 U.S. 817); *accord United States v. Saldana*, 807 F. App'x 816, 819–20 (10th Cir. 2020).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive

18

requirements for release. *Saldana*, 807 F. App'x at 819–20. Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Jackson and other inmates. *See Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

Jackson's medical records establish that he is obese, with a BMI greater than 30 (approximately 33.0 based on a height of 5'10" and a weight of 230 pounds)[1], which the CDC has confirmed is a risk factor that places a person at increased risk of severe illness from Covid-19.  *See* CDC Risk Factors (as updated). His medical records do not establish the presence of any other risk factors, contrary to Jackson's claims of having asthma and high blood pressure. (Ex. 3, 2019 BOP Medical Records; Ex. 4, 2020 BOP Medical Records (both under seal)). Nonetheless, given the heightened risk that Covid-19 poses to someone with obesity, Jackson has satisfied the first eligibility threshold for compassionate release during the pandemic. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A).

Despite his medical conditions satisfying the initial eligibility criteria, Jackson remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." As with the other requirements in § 1B1.13, this prohibition on releasing dangerous defendants applies to *anyone* seeking compassionate release. 18 U.S.C. § 3582(c)(1)(A) (requiring that release be "consistent with" § 1B1.13);

---

[1] Jackson's height is noted in the PSR as "approximately 5'10"".  (PSR at ¶ 92). His weight in the PSR was noted as 230 pounds at that time (August 2019). (*Id.*). The BOP weighed Jackson at 226 pounds in December 2019. (Ex. 3, 2019 BOP Medical Records at 3).  Counsel for the government requested an updated weight for Jackson from BOP and was informed his current weight is 230 pounds.

*United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) (confirming that a
released defendant must "not represent a danger to the safety of any other person
or the community"). Although a court must also evaluate the defendant's
dangerousness when balancing the § 3553(a) factors, dangerousness alone is a per
se bar to release under USSG § 1B1.13(2). *United States v. Knight*, No. 15-20283,
2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020); *United States v. Oliver*, No.
2:17-cr-20489, 2020 WL 2768852, at *7 (E.D. Mich. May 28, 2020).

An evaluation of dangerousness under § 3142(g)—which § 1B1.13(2)
references for its dangerousness determination—requires a comprehensive view of
community safety, "a broader construction than the mere danger of physical
violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per
curiam). Indeed, even when considering *pretrial* detention under § 3142(g), "[t]he
concept of a defendant's dangerousness encompasses more than merely the danger
of harm involving physical violence." *United States v. Williams*, No. 20-1413,
2020 WL 4000854, at *1 (6th Cir. July 15, 2020) (citing *United States v. Vance*,
851 F.2d 166, 169–70 (6th Cir. 1988)). That reasoning applies even more strongly
post-judgment, when the defendant's presumption of innocence has been displaced
by a guilty plea or jury's verdict and when "the principle of finality" becomes
"essential to the operation of our criminal justice system." *Teague v. Lane*, 489
U.S. 288, 309 (1989).

Section 1B1.13(2) is thus a significant hurdle to release. It bars the release of violent offenders. It bars the release of most drug dealers, "even without any indication that the defendant has engaged in violence." *United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010) ("[D]rug trafficking is a serious offense that, in itself, poses a danger to the community."); *Knight*, 2020 WL 3055987, at *3. It bars the release of defendants whose offenses involved minor victims or child pornography. *See United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *3 (6th Cir. July 8, 2020).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. Drug overdoses are skyrocketing. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Jackson has failed to clear this hurdle, because his release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Jackson is a member of a violent, criminal street gang, and conspired to commit

murders and trafficked controlled substances in furtherance of that gang. (See Jackson Rule 11 (ECF No. 889, PageID.8266-70) and PSR ¶¶ 9-39). His convictions in this case came after previously serving a prison term for a firearm offense where he fled from police who were responding to a shots fired call and dropped a firearm. During that prison term in 2013 and 2014, Jackson had 24 separate rule violations, including threatening behavior, destruction of property, assault and battery of a prisoner, and multiple sexual misconduct violations. (PSR at ¶ 77).

While awaiting trial at Milan FDC in this case, Jackson received multiple sanctions, one for fighting, another for assaulting without serious injury, and another sexual misconduct violation, and he received significant loss of privileges and good conduct time disallowances as a result. (Ex. 5, BOP Discipline Records (under seal)).

Jackson is an incredibly dangerous individual when he is not incarcerated, and as his behavior while incarcerated has shown, while the broader community may be safe from him while he is prison, he is a danger to others even while incarcerated. There is no doubt that if released today, Jackson would reoffend in short order and endanger the safety of the community.

Jackson is not eligible for compassionate release.

### C.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Jackson eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Jackson's criminal conduct, both before his arrest and during his incarceration, and his criminal history indicate that he poses a strong risk of recidivism if he released from prison. The seriousness of his conduct, conspiring to commit murders in support of a violent street gang in Detroit, and trafficking in drugs in

24

furtherance of the gang, cannot be overstated.  And Jackson's criminal history and behavior while in custody further show that he has no respect for the law and will likely continue to commit crimes and victimize the community after serving his prison term, let alone after serving less than his full prison term.

**III.    If the Court were to grant Jackson's motion, it should order a 14-day quarantine before release.**

If the Court were inclined to grant Jackson's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

### Conclusion

Jackson's motion should be denied.


Respectfully submitted,

MATTHEW SCHNEIDER,

United States Attorney

_s/  Andrew R. Picek_
ANDREW R. PICEK
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9652
E-Mail: andrew.picek@usdoj.gov
Bar No. OH0082121

Dated: October 19, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 19, 2020 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification to all counsel of record.

I further certify that I sent a copy of the foregoing paper via U.S. Postal Mail to the defendant in this matter to the address listed below:

Lomnil Jackson #5451-039
USP Victorville
U.S. Penitentiary
P.O. Box 3900
Adelanto, CA 92301


*/s/ Andrew R. Picek*
ANDREW R. PICEK
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9652
E-Mail: andrew.picek@usdoj.gov
Bar No. OH0082121